Ted W. Cassman
       Email:  cassman@achlaw.com
ARGUEDAS, CASSMAN & HEADLEY LLP
803 Hearst Avenue
Berkeley, CA 94710
Telephone:   (510) 845-3000
Facsimile:     (510) 845-3003

Counsel for Craig Lipton

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. 11-CR-799 CRB |
| ) | |
| Plaintiff, ) | DEFENDANT CRAIG LIPTON'S |
| ) | SENTENCING MEMORANDUM |
| v. ) | |
| ) | |
| CRAIG LIPTON, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ii

I.      INTRODUCTION ........................................................................................ 1

II.     BACKGROUND ........................................................................................... 1

        A.      Youth .......................................................................................... 1

        B.      Real Estate Career ...................................................................... 3

        C.      Family ......................................................................................... 4

        D.      Other Passions, Business Ventures and Contributions to Others ............ 7

III.    THE OFFENSE ........................................................................................ 10

IV.     POST-OFFENSE CONDUCT .................................................................... 12

V.      ARGUMENT ............................................................................................ 14

        A.      The Plea Agreement, Sentencing Guidelines and Recommendations
                of the Government and Probation Office ................................... 14

        B.      The Sentencing Guidelines and Section 3553(a) Factors .................... 15

                1.      The Aberrant Nature of Mr. Lipton's Misconduct ................... 16

                2.      Psychological Factors ........................................................ 17

                3.      Post-Offense Rehabilitation ............................................... 18

                4.      Others' Exceptional Financial and Emotional Dependence ......... 19

                5.      Consistency in Sentencing ................................................. 21

VI.     CONCLUSION ....................................................................................... 22

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>

3

*Cunningham v. California*, 549 U.S. 270 (2007) .......................................................... 15

4

*Gall v. United States*, 552 U.S. 38 (2007) .................................................................... 15

5

*Kimbrough v. United States*, 552 U.S. 85 (2007) ......................................................... 15

6

*Pepper v. United States*, 562 U.S. 476 (2011) ....................................................... 18, 19

7

8

*United States v. Nieto*, No. CR 10-0052 JB, 2011 U.S. Dist. LEXIS 14424 (D.N.M. Jan. 5, 2011) ................................................................................................................ 18

9

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ................................................. 16

10

*United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011) ........................................... 19

11

12

*United States v. Shy*, 538 F.3d 933 (8th Cir. 2008) ..................................................... 19

*United States v. Stall*, 81 F.3d 276 (6th Cir. 2009) ..................................................... 16

13

14

*United States v. Stewart*, No. 8:09CR282, 2011 U.S. Dist. LEXIS 89767 (D. Neb. Aug. 11, 2011) ............................................................................................................. 19

15

16

17

<u>Other Authorities</u>

18

18 U.S.C. § 3553 ................................................................................... 15, 19, 21

19

U.S.S.G. § 5K1.1 ..................................................................................... 15

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Even in the crowded field that is currently before the Court, Defendant Craig Lipton stands out brightly.  Mr. Lipton has contributed significantly to his chosen community, San Francisco, and has greatly enriched the lives of those fortunate enough to know him.  Over the last two decades, he has endured devastating emotional and financial blows yet emerged unbent, unbowed and without bitterness or self-pity.  He has fervently and loyally supported friends and family and those less fortunate than he through their own calamities and travails, and is consistently the rock upon which everyone else stands.  And, not surprisingly, at this difficult time he has enjoyed a tremendous outpouring of support from friends and family – including letters of support of public officials and other prominent persons such as the San Francisco City Attorney, Dennis Herrera and S.F.P.D. Chief Attorney Matt Gonzalez.

Tragically, despite all of his accomplishments, contributions to society and well-deserved reputation for honesty, integrity and good citizenship, Mr. Lipton participated in a criminal scheme and now comes before the Court for sentencing.  Mr. Lipton's participation in this offense was, by comparison to others, relatively minor and short-lived.  And, consistent with his unblemished record and law-abiding history, after he was contacted by law enforcement Mr. Lipton promptly acknowledged guilt and was among the very first to commit to plead guilty and to agree to cooperate with their investigation.  Given this exceptional individual and the extraordinary extenuating circumstances elaborated below, we ask the Court to impose straight probation with a fine as the punishment that is "sufficient but not greater than necessary" to accomplish the purposes of the sentencing laws.

## II.    BACKGROUND

### A.    Youth

Mr. Lipton grew up in a middle class neighborhood in the suburbs of Detroit during the 1970's.  His was not a background of poverty or disadvantage, but neither did he arrive in this world with a silver spoon in his mouth.  Far from it.  Mr. Lipton's father

was a first generation immigrant (his parents having fled Eastern Europe) who served during Korea, became an attorney and worked hard virtually seven days a week to keep his family housed and fed and to educate his three children.  As Mr. Lipton's siblings remember:

> We grew up about 15 minutes north of Detroit. We were raised in a middle class neighborhood. Our mother served a traditional role of staying at home and doing her best to raise our family. Throughout our childhood, our dad worked late into the night and on most weekends. He spent his career fighting for the poor and those dealt a difficult hand in life.

Letter of Marc and Jody Lipton, Exhibit A.  Both by example and demand, Mr. Lipton's father and mother instilled in their four children the values of integrity, honesty, education, and hard work.  These lessons have stuck with Mr. Lipton throughout his life.

From an early age, Mr. Lipton exhibited an entrepreneurial flare – earning spending money by raking leaves, shoveling snow, and completing other such chores.  As they matured a bit, each of the Lipton children worked for their dad at his law firm.  Mr. Lipton's enterprising flare continued during his college years at the University of Michigan, as explained by his roommate:

> Craig and I lived together in college and at that time, were business partners.  Craig and I started a U of M hat business together and I have very fond memories of those experiences with Craig.  In that time, Craig was a passionate and relentlessly hard-working partner.  We would spend 5-6 hours every Saturday selling hats before each U of M football game, carrying garbage bags filled with hats over our shoulders throughout the streets of Ann Arbor, MI.  It was an experience in hard work, commitment, and investment that I've carried with me through my life.

Letter of Harry Parr, M.D., Exhibit A.  Mr. Lipton's industriousness – his remarkable energy, business savvy and creativity, together with his drive to succeed at every venture he undertakes – are characteristics noted by everyone who knows him.

After college, Mr. Lipton decided not to pursue the family métier (his father and siblings are all attorneys).  Instead, in 1989 he drove across the country with a college buddy and decided to pursue a career in real estate.  Mr. Lipton started in San

Francisco literally from scratch, arriving without connections or introductions.  But one recurrent theme running through his life is that people of all stripes like Mr. Lipton, and he establishes and maintains close and enduring friendships.  Shortly after arriving in town, Mr. Lipton was embraced by older mentors and secured positions as an apartment manager and as an assistant in a brokerage firm.  In 1990, Mr. Lipton secured his real estate license, and over the next few years he established himself as one of the most knowledgeable brokers in the Tenderloin district.

### B.    Real Estate Career

In 1995, at age 28, Mr. Lipton began personally investing in real estate with the purchase of a 16-unit apartment building.  This led to his establishment of his own investment company and to the purchase of several more properties over the next few years – by 1998 he and his partners owned six buildings.  In 1996, Mr. Lipton left the brokerage firm and devoted himself to purchasing, developing and maintaining his investments.  After hiring his own team to handle repairs on his properties, Mr. Lipton obtained a general contractor's license and launched a construction company primarily devoted to making renovations and repairs on his buildings.

Over the last 20 years, Mr. Lipton has developed a well-earned reputation for responsible real estate investment and property management in the Tenderloin.  Far from being a "flipper" or slum lord, Mr. Lipton has always been devoted to improving the lives of his tenants and, more generally, the beauty of the community around his buildings.  His efforts are recognized by tenants and city officials alike.  As City Attorney Dennis Herrera attests:

> I have . . . personally witnessed his generosity of effort and spirit as he worked in underserved communities while developing his business; in particular, protecting tenants at tenderloin properties that he owned and/or managed as the residents worked collectively to rid their neighborhood of drug dealing and prostitution. I believe Craig's commitment to family, friend and community are much more indicative of his character than the unfortunate circumstances which place him before the court.

Letter of Dennis Herrera, Exhibit A.  Impressively, Mr. Lipton's generosity and care as a landlord is confirmed by his tenants, even those who do not know him well:

> These years have been astoundingly challenging for me personally and financially. If it were not for Craig, I trust, I could be homeless. Craig has time and again, accepted late rent, partial payments, needed payment arrangements, I grow tired of just recounting. This is a graciousness I guarantee would not be offered by any other Land Lord. His actions or lack of legal actions towards me and my family has literally been my saving grace. I don't know Craig that well, I don't really know why he has been so good to me, but it is my opinion he is a uniquely outstanding human.

Letter of Evangelina Avenetti, Exhibit A.

> Soon after Craig bought [my] building, major improvements began: building infrastructure (elevator rewired completely, boiler replaced), convenience (laundry room installed, website built to report maintenance issues and pay rent electronically), as well as cosmetic (backyard re-done to include dog-run, new carpet, etc). Local artists are employed to paint murals. The building has become a safer place to live, the tenants are staying longer and getting to know each other. The quality of life in my building and the whole block has improved greatly.

Letter of Megan Bury, Exhibit A.  And Mr. Lipton's priorities and commitment as a landlord have been recognized in the media over the years.  *See* "Sustain and Maintain, *SF Apartment Magazine*, January 2017; "Tenderloin Building Gets a Makeover," *San Francisco Chronicle*, February 21, 2013, Exhibit B.

### C.      Family

Not long after moving to San Francisco, Mr. Lipton met Miriam Mackarness. They promptly fell in love and moved in together, and for years Miriam helped Mr. Lipton manage apartment buildings.  Married in 1996, their first child was born in 1998 and their second in 2001.  Although Mr. Lipton loved Miriam deeply and wanted to be a devoted father, he was also unhealthily consumed by his business operations.  After the birth of their second child, Miriam felt more and more abandoned, and Mr. Lipton was ill equipped to acknowledge, let alone address, her unhappiness.  In early 2002, Miriam told him that their marriage was over.

1    Mr. Lipton was crushed.  He still loved Miriam, and a divorce was something that

2    he had never imagined. This was his first taste of failure.  Becoming depressed and

3    anxious, losing weight and suffering sleep deprivation, Mr. Lipton sought professional

4    help from a psychologist and from a psychiatrist.  For a time, Mr. Lipton was prescribed

5    Lexapro and Wellbutrin and other medications to treat his depression and anxiety.  After

6    some months and a lot of therapy, Mr. Lipton came to the realizations that his marriage

7    could not be saved and that he must refocus his efforts on working with Miriam to create

8    a safe, comfortable and loving environment for their children.  As Mr. Lipton explains:

> The divorce was devastating for me.  At her request, I moved out of our
> home. I immediately started seeing a psychologist who prescribed
> medication to treat my anxiety. I dropped 30 pounds in six weeks.  After a
> lot of therapy, I made peace with Miriam, and we quickly came to
> agreements on finances and shared custody. We both wanted what was
> best for the kids and knew that we had to be co-parents.

13   Personal Statement, p. 2.

14   Just two years later, Miriam was diagnosed with breast cancer.  For Mr. Lipton,

15   the thought that he could lose Miriam yet again and that his children could be left

16   without their mother was unbearable.  He devoted himself to Miriam's care and support

17   like the most doting and loving husband.  As Miriam describes:

> Shortly after our divorce I was diagnosed with a very aggressive and
> unusual form of breast cancer. We were only 38 years old and our children
> were 5 and 7. Even with all of the unpleasant post-divorce emotions still
> fresh and abounding, Craig rallied wholeheartedly behind me. He took on
> more with the kids and showed up in every way.  He came to my surgeries
> (17 in all) and to all of my chemotherapy sessions. Sometimes we didn't talk
> much, but there he was. Even after my recurrence, he always held the
> space that I was going to be ok and reach an old age, even when I couldn't
> hold that space for myself. Despite being divorced, we are still a family; a
> strange, modern family perhaps, but a family nonetheless. I know without a
> doubt that Craig would do anything for me – he has demonstrated this again
> and again . . . .

26   Letter of Miriam Lipton, Exhibit A.  Many have noted Mr. Lipton's devotion to and

27   support of Miriam despite their divorce, including our City Attorney:

> I have known Craig for close to 20 years. In that time I have known him to be a dedicated husband, father, friend and community member. In fact, I have been quite impressed at the degree to which he worked to keep his family together while suffering through a painful divorce and also remaining a committed friend and supporter of his ex-wife as she suffered through serious health challenges over the course of the last decade. He has stood by her every step of the way even though they are no longer married.

Letter of Dennis Herrera, Exhibit A.  And Mr. Lipton maintains an exceptionally close relationship with Miriam even after she beat her first bout with cancer:

> [Craig's] relationship with his ex-wife is a model for divorced couples. They are so incredible together. We have traveled with both of them and the kids for the last two Decembers and hope to have a "family trip" this December as well. Can you imagine that? Craig and Miriam Lipton are no longer married, yet still travel together as a family. Their kids are amazing and that is because of their commitment to each other. The children are aware of the details and of course stand by their dad. His ex-wife is still our family and she stands by him as well.

Letter of Marc and Jody Lipton, Exhibit A.

Sadly, Miriam did endure a second bout in 2010, a time that coincided with the events that led up to Mr. Lipton's involvement in his offense; and in January of this year, Miriam endured yet another recurrence.  Through it all, Mr. Lipton has stood by her side, attending doctors' appointments, surgeries and treatments, taking greater responsibility for the children, and lending financial support.

Mr. Lipton's and Miriam's efforts to keep a sense of normality in their children's lives have been remarkably successful, and the children have thrived.  In large part this must be attributed to Mr. Lipton's keen attention and involvement in their lives.  His psychologist observes:

> Craig has been an engaged and caring father. He takes great pride in his children and is concerned about all aspects of their welfare. Despite the divorce from their mother, he has maintained strong bonds with his children and can be counted on to offer continual support, advice and counsel when needed.

Letter of David Brandt, Ph.D, Exhibit A.  Similarly, a close friend from high school notes:

> Craig also is extremely dedicated to his family. He is a great father to his

> two children, providing well for them and emphasizing the importance of education, hard work and involvement with their synagogue. And after being divorced from his ex-wife, they have maintained a close relationship and the ability to co-parent well, always with the best interests of their children as the highest priority.

Letter of Richard Woodworth, Exhibit A.  Even a handyman who routinely makes repairs at Mr. Lipton's home and businesses is impressed his devotion to his children:

> Which brings me to the other thing that stands out, the way he treats his son and daughter. As I tend to be around Craig's family while I am working, I witness their interactions and it is admirable to see Craig teach his son to be a good person and to appreciate things. Craig's care and devotion towards his family is what must drive him. Once driven, Craig broadens his care and devotion to his businesses and all the people that work for him (he employs many people).   There just not many people like Craig Lipton around your honor.

Letter of Noel Yescas, Exhibit A.

Today, Mr. Lipton's son is a freshman at the Cal Poly School of Architecture and his daughter is a high school junior, studying construction management.  Mr. Lipton envisions a day when his son may become a business partner.  His daughter was so inspired by one of Miriam's doctors that she aspires to become a surgeon herself, specializing in reconstructive surgery for cancer survivors.  Mr. Lipton is the sole source of financial support for both children, including two private tuitions.  Mr. Lipton remains Miriam's principal source of financial support as well.

### D.      Other Passions, Business Ventures and Contributions to Others

A man of remarkable energy and drive, Mr. Lipton has always found time to pursue other interests even as he grappled with divorce, Miriam's medical issues, raising children and, as we shall see, the devastation of the financial crisis of 2008 and 2009.  Over the years, in addition to his real estate and construction operations, Mr. Lipton's business ventures have included investments in hotels and self-storage facilities throughout the U.S., a golf course, and several restaurants.  Currently, Mr. Lipton operates three successful restaurants and a wine bar – Papito's in Hayes Valley, Papi's, Matador, and Tender Wine Bar, all located in the Tenderloin.  The recent

opening of Papi's was celebrated in an item published at https://sf.eater.com.  Exhibit C.

About 20 years ago, Mr. Lipton started to have the wherewithal to give expression to his a passion for art.  Since then he has become a serious art collector and patron of artists, both local and from other countries.  As Matt Gonzalez, Chief Attorney of the San Francisco Public Defender observes:

> I can say without hesitation that Craig has been a champion of local artists who often struggle for legitimate opportunities to succeed in what is a very challenging and competitive art world.  He has directly provided artists with commissioned murals and he has purchased their work to encourage their careers and to promote the local cultural scene.  As such, I can say that Craig is held in very high esteem in art circles and he is widely respected for his kindness and support of younger artists.

Letter of Matt Gonzalez, Exhibit A.  Recently, Mr. Lipton commissioned Mexican artists to create murals for his newest restaurant, Papi' and for a tribute to Anthony Torres, aka "Bubbles," a gay artist and activist who was murdered last fall in the Tenderloin.  Articles describing these murals are appended in Exhibit C.  These just two of many art projects that Mr. Lipton has commissioned or supported in San Francisco over the years.

Virtually everyone who knows Mr. Lipton is struck by the generosity and concern for others that he consistently demonstrates, both in his personal and professional lives:

> Craig has a heart of gold and has prided himself on taking care of his tenants and their neighborhoods, while improving his properties and providing for his many employees. Craig's concern for his employees' well-being and that of their families weighs heavily on his heart. Others will tell you details about a lifetime of helping people down on their luck and needing a hand.

Letter of Marc and Jody Lipton, Exhibit A.  A long-time member of his synagogue, Mr. Lipton enjoys support from both his Rabbi and from the Dean of Grace Cathedral, as well.  *See* Letters of Rabbi Ryan Bauer and Malcolm Young, Exhibit A.  To a truly remarkable degree, Mr. Lipton readily offers material support to others in need, often opening up his home or offering loans expecting no repayment.

> When I was in San Francisco to visit Craig he would frequently have a house guest. When I would inquire, the story was always the same but pertained

to a different person. That person was staying with Craig for a little while until they get back on their feet. He would never charge them or ask for anything in return. I always marveled at how he could bring someone into his home and not have it upset the family dynamics.

Letter of Eric Silberg, M.D., Exhibit A. *See also* Letter of Brian Mendelsohn, Exhibit A ("I have known Craig to help many people in the community through opportunities and personal loans, many of which he has never asked to be repaid.").

Others describe the personal assistance they have received from Mr. Lipton:

I personally have fallen into tough financial times and found myself homeless and with health issues that stem from the stress. Without question when Craig found out about my personal issues, he took me into his home and fed me. And he continues with a helping hand and opened his home to me. While staying in his home, Craig placed a cash loan underneath my pillow, to which I'm thankful. He never questioned me how I got to a place in need. He just new [sic] I needed help.

Letter of Will Lizardo, Exhibit A.

I had serious medical problems in 2011. Craig voluntarily paid for a large portion of my medical bills. I wouldn't have been able to complete treatment without his help. I lost my father suddenly about six weeks ago. Craig drove to the South bay at the last minute to support my family and I. He did this despite not knowing if his home in Glen Ellen was destroyed by the raging fires. I am a single mother to a 4 year-old daughter. Craig has made a monthly financial contribution to her 529 college savings account since she was an infant. He plans to do so until she is 18 years-old.

Letter of Laura Domash, M.F.T., Exhibit A.

As previously noted, Mr. Lipton is also a compassionate and generous landlord. *See* Part II.B, *supra*. Mr. Lipton's ex-wife, Miriam, remembers that his commitment to his tenants and to their community was present from the start:

[T]he first buildings Craig purchased in the Tenderloin when we were still in our 20's were fraught with problems: from needing nearly every conceivable physical improvement to inheriting low-income, elderly and even terminally ill tenants. Craig established himself as the kind of landlord who cared deeply about not only restoring these old buildings back to their original glory, but that each and every tenant experience an enhanced quality of life from these improvements. Tenants were grateful. He routinely received

small gifts and baked goods. I was very proud of the work he was doing and the integrity with which he was conducting his burgeoning business in this very challenging city. Yes, he obviously cared about making a living and providing for us and our children, but he was equally motivated by a sense that he was bringing these buildings back to life and felt a true obligation to restore a sense of safety and pride in the people who lived in them as well.

Letter of Miriam Lipton, Exhibit A.

Finally, Mr. Lipton is also a generous employer who strives to ensure that his workers are well paid and secure with excellent benefits:

Craig employs dozens of people who have been with him for decades. He makes every effort to assure they are paid well, have excellent health insurance, and enjoy their work. He takes a very personal interest in each of his employees.

Letter of Laura Domash, Exhibit A.

The second example is simply one of caring for those around him when unfair events are taking place. This relates to the crew of men who he employs to do building maintenance and repair. With the changes in health insurance related to the Affordable Care Act, the current plan that he provided for them was, by his description, more like catastrophic health coverage rather than true health insurance. He signed them up for the higher level plan, knowing that this would incur a greater expense to him but also knowing that it was the right thing to do for these men. It wasn't necessary -- he didn't need to provide them with any insurance coverage at all – but he felt it was the proper thing to do.

Letter of Jonathan Hartman, Exhibit A.

These qualities of compassion, largesse and concern for others, together with a commitment to leaving his community better than he found it, have always defined Mr. Lipton.

## III.    THE OFFENSE

In late 2008, Mr. Lipton was thoroughly pummeled by the financial crisis. Although he had taken steps to diversify his holdings, all of his investments became toxic.  His revenue stream suddenly disappeared, the value of his properties plummeted, and bankers called his loans and froze his credit lines.  Over the next year and a half, he lost hotels, buildings, a restaurant and a golf course.  Mr. Lipton's

residence went into foreclosure, and he took in tenants to help meet the mortgage.  *See* letter of Freya Morgen, Exhibit A.  Mr. Lipton retained a bankruptcy attorney, and his anxiety and panic attacks became unbearable.  As Mr. Lipton remembers:

> By December 2008, total panic had set in. I was way over leveraged, my cash flow from my investments had stopped flowing and I realized I would be out of cash in a few months. I tried to work things out with my bankers and lenders, but matters kept getting worse. The banks froze my credit lines. 2009 was a year of despair. I met with a bankruptcy attorney and gave her a retainer. My older bother [sic] Marc came around and made me a $250,000 emergency loan to bail me out. My mental health deteriorated. I started having panic attacks and near constant raging anxiety. A psychiatrist prescribed meds to help control the panic attacks, reduce my anxiety and help me sleep. My friends call it my zombie year, as I was haggard, medicated and numb.

Personal Statement, p. 3.  His psychiatrist confirms Mr. Lipton's dire mental state at the time:

> In the spring of 2010, he suffered further significant financial loss, alienating his principal investor, and again putting his business empire at risk. His moods began swinging more out of control . . . . His mood swings continued throughout the summer and fall, with clear episodes of impulsivity characterized by excess energy, difficulty managing his businesses, and even consulting a psychic for advice.

Letter of Dean Freedlander, MD, Exhibit A.  As Miriam Lipton explains, there can be no doubt that Mr. Lipton's extreme financial distress and the accompanying emotional turmoil left him vulnerable to the bad judgment that he exercised in connection with the foreclosure market:

> When his finances crashed, it was at the height of the panic around my cancer. I believe Craig reached his breaking point and began struggling to keep it all together for his family, his business partners and his employees. It seemed everything in his life was falling apart. He was not doing well. It is my belief that his desperation to keep his family in house and home and his many employees working and able to provide for their families is what brought him to the place where he made the decision to accept the terms (despite knowing they were wrong) that were inherent in the bidding culture he encountered on the courthouse steps.

Letter of Miriam Lipton, Exhibit A.

> Toward the end of 2009, Mr. Lipton became aware of the foreclosure auctions on

the courthouse steps.  Researching and observing the auctions, he saw a potential business opportunity that might help him keep his businesses afloat and his construction employees working.  Mr. Lipton received a cold shoulder from the other participants at the auction, who seemed to be regulars.  When Mr. Lipton started to bid on properties, some of the regulars confronted him and one attempted to physically intimidate him.  Eventually, in April 2010, Mr. Lipton decided to play ball with the regulars.  Over the next eight months, Mr. Lipton received eight pay-offs from the regulars (totaling $91,000) not to bid on some properties and gave three pay-offs to regulars (totaling $26,000).  PSR, ¶ 15.  After dividing the proceeds with his partners, Mr. Lipton personally realized $13,416.50 from the pay-offs.  PSR, ¶ 15.

Mr. Lipton knew that his conduct was wrong and accepts full responsibility for it. PSR, ¶¶ 18-19.

## IV.    POST-OFFENSE CONDUCT

On January 11, 2011, FBI agents contacted Mr. Lipton at his home.  A light switch went off.  From that moment forward, Mr. Lipton has striven to accept responsibility for his offense and to commence atoning for it.  Mr. Lipton promptly agreed to meet with prosecutors and to assist their investigation.  On two occasions, he sat for extensive interviews with prosecutors and law enforcement.  After the interviews, the lead prosecutor informed undersigned counsel that his team found Mr. Larkin to be credible and forthright and his information helpful.  Mr. Lipton also provided prosecutors with written records of sales, pay-offs received and pay-offs made, which we were informed was also helpful.  Mr. Lipton was among the very first of the defendants to plead guilty in this matter.

As further evidence of the sincerity of his contrition, Mr. Lipton has also openly acknowledged his misconduct to friends, family, colleagues and investors.  His self-recrimination was palpable to his closest friends:

> After Craig's arrest and legal problems, he was a damaged person. He could not sleep or eat. He had medical problems that he did not have to

deal with prior to this stress. His remorse was palpable. He punished himself more than any other person or thing could damage him.

Letter of Eric Silberg, M.D., childhood friend, Exhibit A.

> I know from talking with Craig that he realizes the serious and wrongful nature of his actions, how his involvement in bid-rigging at real estate foreclosure auctions affected home sellers and banks in addition to third party participants.  And, I know that Craig has suffered over the past several years while awaiting sentencing.

Letter of Edward Stone, M.D., another childhood friend, Exhibit A.  And as Miriam Lipton sums up:

> I am proud of how he has conducted himself throughout this entire unfortunate experience. This has been the dark night of his soul.  He has never made excuses.  He admitted his crime, took immediate, personal responsibility and has been bravely facing the consequences for seven long years.

Letter of Miriam Lipton, Exhibit A.

After Mr. Lipton decided to assist the government's investigation, his personal circumstances did not immediately improve.  Miriam underwent a double mastectomy and chemotherapy.  Mr. Lipton, of course, was with her every step of the way.  In response to his guilty plea, First Republic Bank and Charles Schwab closed his accounts.  Some friends and colleagues ostracized him.  Mr. Lipton voluntarily relinquished his real estate license.  Yet, characteristically, Mr. Lipton persevered.  He has worked assiduously to stabilize his business ventures, to develop desperately needed beautiful new living spaces for tenants and buyers, to create good jobs and opportunities for his employees, and to provide for his family.

With the government's full knowledge and after disclosing his legal problems to his partners, Mr. Lipton re-entered the foreclosure market.  This time, he operated as he had originally intended:  bidding on properties in a fair market without collusion or manipulation.  By the end of 2011, Mr. Lipton had acquired 27 properties, and he continued to bid at the foreclosure auctions through 2014.  More recently, Mr. Lipton

has focused on purchasing empty lots and constructing condominiums from the ground up, remodeling individual units, renovating dilapidated apartment buildings, and operating restaurants.  He has also transformed his construction company so that it is no longer merely an adjunct to his real estate business and now receives 85% of its work from other sources.  The construction business is booming; with more than 20 projects currently booked or underway, he now has 26 employees.  Mr. Lipton's restaurants, which are also doing well, employ another 72.

In January, Miriam Lipton was diagnosed with a second recurrence, this time Stage IV metastatic breast cancer.  Stoic and optimistic as ever, last month she began chemotherapy and currently awaits her first post-treatment report.  As of this writing, Miriam has completed a chemotherapy treatment and is awaiting the results of an MRI to determine her status.  As always, Mr. Lipton stands by her side.

In sum, Mr. Lipton's response to his tragic indiscretion has been exemplary.  With no excuses, he promptly took strides to atone for his offense and to regain moral standing.  As his psychologist explains:

> Craig has demonstrated that he has the capacity to learn from his mistakes and to grow from adversity. His response to his felony conviction has been to take stock of his life path and make more reflective and ethical decisions and choices. He expresses genuine remorse and is committed to making amends for his offense.

Letter of David Brandt, Ph.D., Exhibit A.

## V.    ARGUMENT

### A.    The Plea Agreement, Sentencing Guidelines and Recommendations of the Government and Probation Office

Mr. Lipton has agreed with the government that the U.S. Sentencing Guidelines, as applied in his case, yield a total offense level of 13.  The probation department concurs with this calculation, and notes that the Guidelines, for a defendant like Mr. Lipton with no criminal history, call for a sentencing range of 12 to 18 months imprisonment.  PSR ¶¶ 34, 64.  The probation department recommends a variance to a

non-custodial sentence of three years of probation, with 6 months home detention, a $60,000 fine, and restitution in the amount of $13,416.50.  The report makes clear that this recommendation is made without consideration of a potential § 5K1.1 motion by the government.

The government has informed counsel that it will make such a motion and that it will seek a downward departure of 40% from the bottom of the guideline range in the plea agreement and will recommend a sentence of 7 months in prison.  This would reduce Mr. Lipton's offense level to Zone B, permitting a probationary sentence under the Sentencing Guidelines.  The government also recommends 3 years of supervised release, a fine of $3,000, and restitution in the amount of $13,416.50.

Mr. Lipton asserts that there are additional bases for downward variance both because of the exceptional nature of his assistance to the government and for the other § 3553(a) factors set forth below, and that a sentence of one year's probation without home detention, a fine of $3,000 and restitution of $13,416.50 should be imposed.

**B.    The Sentencing Guidelines and Section 3553(a) Factors**

The U.S. Sentencing Guidelines are advisory and establish only a "starting point" for the district court's sentencing determination.  *Gall v. United States*, 552 U.S. 38, 57 (2007); *accord Cunningham v. California*, 549 U.S. 270, 286-87 (2007).  District courts must consider the Guidelines, but should "tailor the sentence in light of other statutory concerns, as well."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  Specifically, courts must determine the appropriate sentence by considering all of the factors set forth in 18 U.S.C. § 3553(a).  *Gall*, 552 U.S. at 49-50.

Section 3553(a) makes clear that the appropriate sentence is one that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2" of Section 3553(a).  These purposes include: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense; the need for the sentence

imposed to protect the public from further crimes of the defendant; and the kinds of sentences available.  18 U.S.C. § 3553(a)(2).

### 1. The Aberrant Nature of Mr. Lipton's Misconduct

When the offense of conviction is an extreme departure from an otherwise well-led life and there is no likelihood of re-offense, a variance from the guideline range may be warranted.  *See United States v. Pauley*, 511 F.3d 468, 470 (4th Cir. 2007); *United States v. Stall*, 81 F.3d 276, 279 (6th Cir. 2009).  So it is here.  As the PSR recognizes, Mr. Lipton's unblemished record demonstrates that his offense was inconsistent with his character and personal history.  PSR ¶ 81.

Those who know Mr. Lipton best attest to his honesty and integrity.  Miriam Lipton extols his virtues:

> I can in all earnestness tell you that I have known few people in my life who have conducted both their personal and business affairs with the amount of honesty, integrity and generosity of both spirit and personal and professional assets that Craig has. From the very beginning of our relationship and from the beginning of his career, it has been clear that Craig cares deeply for the people in his life.
>
> He is one of the most fair and steadfastly moral people I know and his great emotional and intellectual capacity is deeply integrated with a personal philosophy rooted in fairness. He brings this point of view to every aspect of his life. He goes above and beyond to make sure that the people in his life are well taken care of: from helping people find work, to gathering donations for the children of an independent contractor who has fallen on hard times, to loaning countless people money and forgiving debt, to making sure that his employees all have health care.

Letter of Miriam Lipton, Exhibit A.  A childhood friend is similarly effusive:

> Craig is and was very loyal and thoughtful. Easy to get along with and a caring friend. He would be generous with his time in giving advice or lending clothes, money or food when needed. There were many times over the years I would forget a coat, gloves, lunch or money. Craig would always share what he had or give me his. He would never ask for anything in return. During our childhood, I had never seen or heard of him doing anything illegal or immoral. He was never in trouble and considerate to all.
>
> Craig is one of the most honest friends I have. He only tells you the truth

usually more than he has to or more than you want to hear. The good the bad and the ugly are all on the table for discussion. He is transparent and carries his feelings on his sleeve. These [sic] is no trying to figure out what he is thinking or doing.

Letter of Eric Silberg, M.D., Exhibit A.  Mr. Lipton's offense is difficult to reconcile with his well-established track record of honesty and integrity.

Indeed, Mr. Lipton has been a strong supporter of law enforcement and has on at least three occasions affirmatively assisted investigations and prosecutions.  First, in 2005, Mr. Lipton provided an anonymous tip to the San Francisco County Recorder's Office regarding an attempt to evade higher property taxes by failing to report a change in ownership.  The tip led to the County reassessing the property's value and ultimately recovering $1.34 million.  A copy of an article describing this recovery is attached as Exhibit D.  Second, in 2011 Mr. Lipton discovered an art fraud scheme and confronted the perpetrators online, to which they responded with threats.  Mr. Lipton reported both the fraud and the theft to the FBI.  Investigators followed up on Mr. Lipton's leads, but apparently did not make a case or arrest.  Third, most recently, Mr. Lipton became concerned about graffiti that marred the public art that he supported.  Mr. Lipton contacted the San Francisco Police Department and assisted their investigations by providing still photographs and video recordings of vandalism.  Undersigned counsel has confirmed with the investigating officer that Mr. Lipton's assistance led to the successful arrests and prosecutions of at least 3 individuals.[1]

Mr. Lipton's propensity to assist law enforcement makes his current plight an even greater source of cognitive dissonance.  For all of these reasons, Mr. Lipton's involvement in this offense was completely uncharacteristic.  It was aberrant behavior, and the Court should find a variance on this basis.

### 2.   Psychological Factors

As demonstrated above, Mr. Lipton committed his offense at a time of extreme

---

[1] Undersigned counsel has provided the government attorney and probation officer with the investigating officer's contact information.  The officer told counsel that he would be pleased to share information concerning Mr. Lipton's assistance with them.

financial and emotional distress.  He was not sleeping or eating.  He endured panic and anxiety attacks.  He was a man drowning.  He sought professional help and took prescribed medications.  Both his psychiatrist and psychologist believe that Mr. Lipton's troubled mental state contributed to the poor judgement that brings him before the Court:

> During the period of time when he was purchasing foreclosure properties, Craig was under particular financial and personal stress. There were many people who counted on him for support including many of his employees and he was sleeping poorly and exhibited other heightened signs of stress. I believe his judgment was compromised and shortsighted during this period and he made decisions he now understands were improper and reflected the sense of panic and fear he was experiencing.

Letter of David Brandt, Ph.D., Exhibit A.

> When under stress, Mr. Lipton becomes hypomanic, with excessive energy, rapid thoughts and speech, and impulsive behavior that increased business risk. This occurred immediately following his divorce six years prior to his first encounter with me, and seem to be occurring as I was treating him, requiring the use of the sedating mood stabilizer.
>
> As is typical of bipolar disorder, a patient is more likely to become overly optimistic, overextend himself in business and romance, and make impulsive decisions. This seemed to be happening to Mr. Lipton while he was in treatment with me. It quite likely contributed to his being caught up in an apparently illegal activity.

Letter of Dean Freedlander, M.D., Exhibit A.  As previously noted, Mr. Lipton's friends and family members have reached the same conclusion.  *See* Letters of Marc and Jody Lipton, Miriam Lipton, and Freya Morgan.

The mental and emotional duress that Mr. Lipton endured at the time of his offense supports a variance from the guideline sentence in an appropriate case.  *See, e.g., United States v. Nieto*, No. CR 10-0052 JB, 2011 U.S. Dist. LEXIS 14424 at *14-15 (D.N.M. Jan. 5, 2011).

### 3.    Post-Offense Rehabilitation

The United States Supreme Court has recognized that post-offense rehabilitation "may, in appropriate cases, support a downward variance from the now-advisory

1   Federal Sentencing Guidelines range." *Pepper v. United States*, 562 U.S. 476, 481

2   (2011) (considering post-sentencing rehabilitation).  The *Pepper* Court observed that:

> evidence of . . . rehabilitation may be highly relevant to several of the
> § 3553(a) factors that Congress has expressly instructed district courts to
> consider at sentencing.  For example, evidence of . . . rehabilitation may
> plainly be relevant to "the history and characteristics of the defendant."
> § 3553(a)(1).  Such evidence may also be pertinent to "the need for the
> sentence imposed" to serve the general purposes of sentencing set forth in
> § 3553(a)(2)—in particular, to "afford adequate deterrence to criminal
> conduct," "protect the public from further crimes of the defendant," and
> "provide the defendant with needed educational or vocational training . . . or
> other correctional treatment in the most effective manner."
> §§ 3553(a)(2)(B)-(D); [citation] . . . . [R]ehabilitation may also critically inform
> a sentencing judge's overarching duty under § 3553(a) to "impose a
> sentence sufficient, but not greater than necessary" to comply with the
> sentencing purposes set forth in § 3553(a)(2)."

12  *Id.* at 491.  Although the *Pepper* Court's holding related to post-sentencing

13  rehabilitation, the principles upon which the Court relied plainly apply as well in the

14  context of post-offense, pre-sentencing rehabilitation.  *See, e.g., United States v.*

15  *Robertson*, 662 F.3d 871, 878 (7th Cir. 2011); *United States v. Stewart*, No. 8:09CR282,

16  2011 U.S. Dist. LEXIS 89767 at *6-8 (D. Neb. Aug. 11, 2011); *see also United States v.*

17  *Shy*, 538 F.3d 933, 938 (8th Cir. 2008) (affirming a variance to probation for post-arrest

18  rehabilitation, noting that rehabilitation was genuine and the defendant was a positive

19  contributor to society).

20      As previously noted, after learning of the FBI's investigation, Mr. Lipton promptly

21  agreed to meet with prosecutors and to assist their investigation.  He was forthright and

22  candid, and provided material evidence to law enforcement.  He was among the very

23  first of the defendants to plead guilty.   He has candidly described his offending conduct

24  to family, friends, colleagues, partners, and virtually anyone who will listen.  In every

25  respect, Mr. Lipton has demonstrated his understanding that he alone is responsible for

26  his involvement in this offense, and he has affirmatively endeavored to make amends

27  for it.  For these reasons, Mr. Lipton's post-offense rehabilitation supports a variance.

28  //

### 4.   Others' Exceptional Financial and Emotional Dependence

Mr. Lipton continues to be the sole source of financial support for Miriam Lipton and his children.  Both children have substantial school tuitions.  Although Mr. Lipton has reached a point where his financial affairs are stable, he is still highly leveraged and daily performs a balancing act between outlays for his various ventures and responsibilities.  Recently, Mr. Lipton required another loan from his brother to help him ride through a rough patch.

More significantly, the recurrence of Miriam's cancer has meant that Mr. Lipton is once again thrust into the position of providing emotional support and stability for Miriam and the children.  Once again, Mr. Lipton accompanies Miriam to doctor's appointments and chemo treatments.  Once again, Mr. Lipton must be there for his children as they confront a likelihood that their mother may soon be taken away from them.[2]  The burden is onerous, but Mr. Lipton intends to bear it.

Despite his evident success, Mr. Lipton's business operations have been significantly hampered by the banks' reactions to his conviction.  As noted previously, two banks responded by closing his accounts.  Further, Mr. Lipton has been unable to secure traditional financing for his construction and development projects and is informed that such financing will not be available to him until he is off probation.  The financial hurdles created by his conviction are a cause of additional anxiety, time consumption and cost. This is a major reason for our request to set probation at one year.

Finally, given the number, scope and complexities of Mr. Lipton's business ventures and projects, it is not surprising that Mr. Lipton's days are long, hectic, irregular and unpredictable.  He constantly keeps an impossible number of balls in the air as he manages his developments and renovations, his rental properties, his construction crews, and his restaurants.  Mr. Lipton undertook his

---

[2] Mr. Lipton's daughter will visit colleges this summer in anticipation of her high school graduation.  It appears very likely that he will be only parent able to accompany her.

most recent restaurant projects, Papi's, Tender and Matador, with the intention of co-managing them with Miriam. But since her most recent recurrence, Miriam has not been able to assist, leaving Mr. Lipton solely responsible for supervising those ventures. Almost every night, Lipton makes the rounds between his restaurants and wine bar to ensure that they are operating up to his standards, frequently visiting two or more of them between 10 p.m. and 1 a.m. Given these circumstances, any form of home detention or curfew would interfere with his effectiveness and adversely affect his business operations.

Mr. Lipton is an exceptionally responsible person with extraordinary responsibilities. His ex-wife and children need him. They are fundamentally dependent upon him, both financially and emotionally. Additionally, Mr. Lipton has almost 100 employees who rely on him for their livelihood. All of these considerations support a variance.

### 5. Consistency in Sentencing

A probationary sentence without a condition of home detention and/or electronic monitoring would serve the statutory objective of avoiding disparities among defendants with similar records and similar offenses. 18 U.S.C. § 3553(a)(6). By our count, at least 49 individuals have already been sentenced in this District for bid-rigging foreclosures schemes. Of those who did not go trial, 33 received probation and 10 received straight probation without home detention and/or electronic monitoring. Given the nature of Mr. Lipton's offense and cooperation with the government, together with the other factors supporting a variance as discussed above, we submit that he falls clearly into this latter category.[3]

---

[3] The ten cases with straight probation sentences are *United States v. Wesley Barta*, No. CR 13-413 PJH, *United States v. Thomas Bishop*, No. CR 14-001 PJH, *United States v. Douglas Ditmer*, No. CR 12-448 PJH, *United States v. Thomas Franciose*, No. CR 11-426 PJH, *United States v. Steven Kahan*, No. CR 13-412 PJH, *United States v. Timothy Powers*, No. CR 11-722 PJH, *United States v. Charles Rock*, No. CR 14-607

# VI.   CONCLUSION

In closing, we offer the plea from Mr. Lipton's brother and sister, to which we neither add nor detract:

> [W]e ask that you consider the amazing person Craig is and his long history of being an upstanding person in our family and your community. He has suffered greatly while awaiting sentencing all these years. Craig's determination to stay resilient throughout this process, while he continued working hard to provide for his family, his crew and his community has been inspiring. We respectfully request that [you] consider all that you learn and read about our brother and fashion a penalty that allows him to put this criminal matter behind him, keep his family and businesses together, and continue to contribute positively to your community as he has both before and since the events that led him to your courtroom.

Letter of Marc and Jody Lipton, Exhibit A.  Under all of the attendant circumstances, a sentence of one year probation with a fine of $3,000 and restitution in the amount of $13,416.50 is sufficient but not greater than necessary to accomplish the objectives of the statutory objectives.  We ask the Court to make that order.

Dated: April 19, 2018

_____/s/_____
TED W. CASSMAN,
Attorney for Defendant Craig Lipton

---

PJH, *United States v. Bradley Roemer*, No. CR 15-229 PJH, *United States v. Joseph Vesce*, No. CR 13-415 PJH, *United States v. Jorge Wong*, No. CR 11-428 PJH. Counsel will be prepared to address the disparity in sentencing issue in greater depth and detail at the hearing.